UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

PATRICK NEWTON GREEN #52140    CIVIL ACTION NO. 20-cv-1323

VERSUS    CHIEF JUDGE HICKS

CADDO CORRECTIONAL CENTER ET AL    MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Patrick Newton Green ("Plaintiff") is a self-represented inmate housed at the Caddo Correctional Center ("CCC"). He alleges that several defendants associated with the jail violated his civil rights, primarily in connection with his healthcare. Before the court are Plaintiff's motion for summary judgment (Doc. 23) and a competing motion (Doc. 30) filed by defendants Sheriff Steve Prator, Christine Jacobs, Sgt. Englade, Sheila Wright, and Steve Procell. For the reasons that follow, it is recommended that Plaintiff's motion be denied and that Defendants' motion be granted.

**Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A fact is "material" if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict

for either party.  Anderson, supra; Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986). If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine dispute of a material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

This case presents the typical situation in which the defendants have moved for summary judgement, but it also presents the less common motion by a plaintiff for summary judgment.  Plaintiff, to prevail on his motion, must present evidence that would entitle him to judgment as a matter of law if it went uncontroverted at trial.  International Shortstop, Inc. v. Rally's, Inc., 939 F.2d. 1257, 1264 (5th Cir. 1991); Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 146 (3d Cir. 1999).  When assessing the plaintiff's motion, all facts and inferences are viewed in the light most favorable to the defendant, and all reasonable doubts are resolved in the defense's favor.  Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1016 (5th Cir. 1990).

**Pretrial Detainees and Medical Care**

Defendants have submitted a police report that indicates Plaintiff was arrested in connection with a burglary and was being held, during the relevant time, as a detainee subject to parole revocation.  Most of Plaintiff's claims allege that various CCC personnel did not provide him with adequate medical care.  "The Fourteenth Amendment guarantees

pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" Dyer v. Houston, 964 F.3d 374, 380 (5th Cir. 2020), quoting Thompson v. Upshur Cty., Tex., 245 F.3d 447, 457 (5th Cir. 2001). To succeed on a deliberate-indifference claim, a plaintiff must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 755 (5th Cir. 2001). "Deliberate indifference is an extremely high standard to meet." Id. at 756.

**Wheelchair**

Plaintiff alleged in his complaint that he was a 52-year-old male with a spinal cord injury suffered in a 1999 excessive force incident. He alleged that he arrived at CCC on January 11, 2020 with left side paralysis and, the next day, Deputy Daniels used Plaintiff's wheelchair to escort another inmate and did not return it. Plaintiff alleged that he later tried to walk but fell. He was taken to the infirmary and given another wheelchair. Plaintiff complained that several nurses later asked Dr. Nelson (not a defendant) to confiscate the wheelchair. Nelson did so and provided Plaintiff a walker instead.

Defendant Sheila Wright was the medical director at CCC during all or most of the time that is addressed in this civil action. Wright was succeeded by Kelli Hayes, who has reviewed the medical records and offered a statement made pursuant to 28 U.S.C. § 1746 in support of Defendants' motion for summary judgment. Hayes states that Dr. Nelson is a physician employed by the Ochsner LSU Medical Center and provides services at CCC pursuant to a contract. Plaintiff's medical records indicate that Dr. Nelson did find that a

walker was appropriate for Plaintiff. The first mention of the issue was on January 13, 2020, when Plaintiff was found on the floor of his cell claiming pain from his back injury. Medical notes state that Plaintiff was given a wheelchair and walker and "placed on the MD's list for further eval." Doc. 30-4, p. 18. Notes from January 14 state that Plaintiff claimed partial paralysis and that he was wheelchair bound, but he "uses a walker + cane also." Another note says to discontinue wheelchair per MD. p. 17.

Director Hayes states that Plaintiff claims to be paralyzed but has use of his lower extremities and does not have muscle wasting. Plaintiff was given a walker, but a wheelchair or other equipment would have been provided if a physician recommended it. Plaintiff was in fact later approved for use of a wheelchair.

Plaintiff has not offered any competing testimony by affidavit or otherwise. He points to his medical records, which can be competent summary judgment evidence, and his allegations in his complaint and memoranda, which are not competent evidence. Larry v. White, 929 F.2d 206, 211 n. 12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence.").

The evidence indicates that Dr. Nelson (not a defendant) prescribed a walker rather than a wheelchair for some period of time. Plaintiff alleged that this was at the suggestion of unidentified nurses. Defendants have challenged this claim in their motion for summary judgment, and Plaintiff has not pointed to competent evidence that creates a genuine dispute as to whether any of the named defendants engaged in deliberate indifference to a serious medical need in connection with Dr. Nelson's decision. Defendants are entitled to summary judgment on this claim, and Plaintiff is not.

**Nurse Kim Brown; February 11, 2020**

Medical Director Hayes explains in her statement that, beginning in November 2019, inmates were required to make sick call requests using electronic tablets. The inmate handbook required that requests for medical care or attention be submitted as a sick call request (and not as a Kite or other communication). The purpose of the procedure is to ensure that there is documentation of medical requests and that inmates have their medical issues addressed. Doc. 30-3, Ex. 1. The handbook explains: "When non-emergency care is needed, an Inmate must fill out a sick call slip." Sick call is conducted daily Monday through Friday. Emergency care is available 24 hours a day. Doc. 30-5, Ex. 3. A note in Plaintiff's medical records from the day after his arrest, January 12, 2020, says, "Inmate voiced understanding of kite and sick call procedure." Doc. 30-4, p. 19.

Plaintiff complained in his complaint and motion that on February 11, 2020, he sought medical care, and Nurse Kim Brown was angry with him, disregarded his complaint, and directed him to submit a sick call request. Plaintiff stated that the incident began when a former cellmate told a deputy that Plaintiff was in pain, and the deputy mistakenly called in a medical emergency and reported chest pains. In any event, Director Hayes explains that the incident happened after sick call hours, but Plaintiff was taken to the medical department based on the report of an emergency condition. Medical records from that day state that Plaintiff said he thought he had a temperature and a urinary tract infection ("UTI"), so the nurse checked his vitals and told him to fill out a sick call request. Plaintiff responded, "Well that's all I was trying to do anyway." He was returned to the housing unit in stable condition. His temperature was only 98.2 degrees. Hayes states that

Nurse Brown correctly applied the sick call policy. Plaintiff alleges that another deputy returned him to the housing unit, completed a sick call form for Plaintiff, and submitted the form to medical for him. Plaintiff alleged that he was never called for this sick call appointment. Hayes states that CCC records do not reflect any such sick call request.

Plaintiff makes much of this incident and complains that Nurse Brown intentionally failed to assist him with his medical complaints. He also notes that she responded to one of his requests, in which he noted that he was partially paralyzed, by asking what hospital made such a diagnosis. These disagreements do not amount to a constitutional violation.

As noted above, a lack of or delay in medical care violates the constitution only when prison officials demonstrate deliberate indifference to serious medical needs, which constitutes an "unnecessary and wanton infliction of pain." Estelle v. Gamble, 97 S.Ct. 285, 291 (1976). A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345 n. 12 (5th Cir. 2006). Deliberate indifference will be found only where the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 114 S.Ct. 1970, 1984 (1994). Neither unsuccessful medical treatment, mere acts of negligence, nor medical malpractice give rise to deliberate indifference. Gobert, 463 F.3d at 346.

Plaintiff's disagreement with medical staff about the proper procedure for requesting care do not amount to deliberate indifference to a serious medical need. Plaintiff may have been unhappy with Nurse Brown's instructions or attitude, but she did check his

vital signs and determine that he lacked fever, which indicated he likely did not have a UTI. She also instructed him on how to seek additional medical care. Plaintiff contends that a sick call request was submitted by a deputy on his behalf, but there is no summary judgment evidence of such a request. Furthermore, there is no indication in the medical records that Plaintiff suffered any significant consequences as a result of not having a sick call the following day. Defendants are entitled to summary judgment with respect to claims based on this matter.

**Resolution of Kites and Grievances**

Plaintiff complains throughout his complaint that various CCC officials did not resolve his administrative grievances to his satisfaction. He contends that Sgt. Englade held one grievance until the 30-day time limit passed, then filed it in and denied it as untimely. Englade submitted a statement pursuant to Section 1746 in which he squarely denied this allegation. Plaintiff also complains that former Medical Director Sheila Wright did not properly respond to some of his kites in which he complained about nurses and his medical care.

Plaintiff "does not have a federally protected liberty interest in having [his] grievances resolved to his satisfaction." Geiger v. Jowers, 404 F.3d 371, 374 (5th Cir. 2005). And "any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." Id. at 374. To the extent Plaintiff attempts to base a claim on his dissatisfaction with the resolution of his grievances and other complaints lodged with Director Wright or other administrators, the claims are subject to dismissal. The court will take into consideration Plaintiff's complaints to Wright

and others, insofar as they relate to potential claims of deliberate indifference to a medical need, but these facts do not support a claim for unsatisfactory resolution of the complaints.

**Foley Catheter**

Plaintiff was taken to the Ochsner LSU emergency department on the day of his arrest, January 11, 2020. He reported that he had done "self-caths" for 21 years due to his spinal cord injury. Self intermittent catheterization (SIC) is when a patient inserts a catheter himself and allows the bladder to drain to completion before removing the catheter. This is usually done several times a day. Plaintiff expressed concern that the jail staff would not give him self-cathing supplies more than every eight or ten hours, which could cause abdominal pain.

The Ochsner emergency department placed a Foley catheter, which remains in place and collects urine in a bag that can be changed. A referral to the Ochsner urology department was ordered "to ensure that it is removed or replaced in a timely manner." The note warned that if a Foley catheter remains in place for an extended period, a patient can develop infections. If a patient develops bloody urine or other urine problems, he should be taken to the emergency room. Plaintiff's Ochsner LSU records, all 700 pages, are filed at Doc. 24.

CCC transported Plaintiff to the Ochsner urology department on February 21, 2020. His Foley catheter was in place. A note from the visit states: "NGB (neurogenic bladder) secondary to SCI (spinal cord injury) change to SIC (self intermittent catheterization) agree with plan as noted." Another note states: "Foley catheter removed today. Rx given for

16F catheters for patient to CIC every 4 hours daily." This referred to clean intermittent catheterization (CIC), also sometimes called SIC; 16F indicates a size of catheter.

The Ochsner records state that the Foley catheter was removed and suggest that the Foley was to be discontinued in favor of SIC. But it appears that a new Foley catheter was put in place during the visit. That is evidenced by a February 21, 2020 note in the CCC medical records that the inmate returned from Ochsner "with indwelling Foley catheter in place still." The note stated that CCC "will continue use of Foley per Nurse Procell."

Plaintiff alleges that Nurse Procell and other medical staff were at fault because they left the Foley catheter in him for 90 days, which Plaintiff alleges caused a serious infection and aggravated his paralysis. Plaintiff, after he returned from Ochsner on February 21, came to the attention of CCC medical staff again on March 13, 2020 when he was found on the floor and stated that he fell off the toilet because of muscle spasms in his legs. He was taken to medical by wheelchair, evaluated, and returned to housing. There was no mention of the catheter in this note.

Plaintiff fell off the toilet again on April 6, 2020. The medical note stated that Plaintiff had a Foley catheter in place that he said had been there for three months. The nurse spoke to Dr. Byrd, who instructed the nurse to change the Foley catheter, which was done using a sterile technique. Plaintiff later began using the self-catheterizing procedure. A note from April 9, 2020 shows that Plaintiff reported that the nurse had inserted a new catheter in him on April 6, but it was not flowing well. It appears that the Foley catheter was ordered discontinued on April 17, 2020. Notes after that indicate that Plaintiff was often provided self-catheter supplies. He was seen often by Ochsner LSU urology

department, which in April 2021 installed a more permanent suprapubic catheter that employs a tube placed directly into the bladder through the abdomen.

Plaintiff complains that CCC staff did not remove his Foley catheter for 90 days. The device can apparently be used for long periods of time, so long as it is replaced periodically. Medical Director Hayes states that Foley catheters are sometimes ordered to remain in place for 90 days. The records reflect that a Foley was placed on January 11 and removed and (apparently) replaced with a new Foley device on February 21, which was 41 days later. It was again replaced at CCC on April 6 after Plaintiff fell, which was only 45 days since the last replacement. There was no period of more than 45 days in which a Foley catheter remained in place.

Plaintiff appears to argue that CCC should have discerned from the fact that the Ochsner physician prescribed self-catherization materials that the Foley catheter was to be removed after the February visit. Director Hayes states that there was no order that the Foley catheter be removed, and there does not appear to be any such order in the medical records. If that was the intent of the physician who prescribed the self-cath materials, it was not made clear in any order sent to CCC. In any event, the catheter was changed in February and again in April, and there is no evidence in the record that Plaintiff suffered serious infection or other effects as he alleges in his complaint. The records do show that Plaintiff frequently received medical attention in connection with various medical problems, and he was given multiple prescription medications and medical supplies to treat his conditions. The summary judgment evidence does not present even a genuine dispute as to whether any of the named defendants engaged in deliberate indifference to a serious

medical need in connection with the Foley catheter. Summary judgment for the defendants should be granted on all claims based on this matter.

**Catheter Supplies**

Plaintiff complains that CCC medical staff did not provide him with the number of self-catheter devices that were ordered by physicians. The records indicate that physicians directed that Plaintiff be allowed to self-catheterize about every four hours or as needed. A log sheet (Doc. 35-1, p. 15) notes the dates on which Plaintiff was given supplies between April 17, 2020 and June 5, 2020. The entries state that Plaintiff was given a new supply about every three days. Another log from June 9, 2020 through January 15, 2021 indicates that Plaintiff was regularly given multiple catheters, usually 30 at a time, and related supplies. Doc. 35-1, p. 22.

Medical Director Hayes states in her declaration that Plaintiff's allegations are "not correct and in fact more than the number of catheters recommended have been provided." She added that if Plaintiff were out of catheters, it would take only a simple request by electronic tablet to obtain more supplies. She also noted that "this is not a sterile procedure and it is not inappropriate for a catheter to be re-cleaned and re-used." Accordingly, even if Plaintiff had temporarily exhausted his supply and did not request additional catheters, he was not without a catheter. But that never happened, Hayes states, because CCC "provided him with catheters in compliance with every order received." Plaintiff particularly alleged that on April 29, 2020, he was without a catheter for two days. Director Hayes points to records that document that Plaintiff was given nine catheters on April 25

and nine more on April 29. He makes other complaints about intentional failures to provide catheters on certain dates, but the records undermine his allegations.

The need for a catheter can be a serious medical need, but the summary judgment record contains no evidence that any defendant was deliberately indifferent to Plaintiff's catheter supply needs. The records show, instead, that the staff responded to Plaintiff's complaints about his medical condition, and they routinely provided catheter materials as directed. If there was some short period of time in which Plaintiff did not have all of the items he desired, there is no basis to attribute it to deliberate indifference by anyone. And Plaintiff was able to avoid any resulting harm by cleaning and reusing any of the multiple catheter devices he had been supplied. Defendants are entitled to summary judgment with respect to all claims based on this issue.

**Foot Injury**

Plaintiff alleges that Christine Jacobs slammed a cell door on his foot. Jacobs offers a declaration made pursuant to Section 1746. She explains that she is an investigator who looked into a matter where Plaintiff was found to have bypassed the mail policy by having an acquaintance at the University Health Information Management Department hide non-medical documents inside medical records that were mailed to Plaintiff at the jail. This was done in an effort to avoid mailroom screening.

Jacobs states that, after an interview of Plaintiff on August 25, 2020, she escorted him back to disciplinary housing by wheelchair. Plaintiff claimed that Jacobs bumped his right foot on the cell door as she was opening it. Plaintiff said he did not need to go to medical, but Jacobs wanted to document that there was no incident or injury. Medical staff

examined Plaintiff's foot, and video of the incident was preserved. The video shows that Jacobs opened the door in a normal manner, and the door slightly bumped Plaintiff's right foot (as he sat in a wheelchair) when it opened. It is almost unimaginable that any injury, even a slight bruise, would result from the minor contact.

The medical note from August 25, 2020 states that Plaintiff was brought to medical after a cell door was closed on his right foot, and he complained of pain. "No deformity or discoloration. Will get xray." A photograph of Plaintiff's foot is attached to Jacobs' declaration, and it does not reflect any injury. An x-ray report (Doc. 30-4, p. 21) stated that two views of the right foot showed no fracture or dislocation, all areas of the foot were intact and free of trauma, and there were no changes in the soft tissues.

For a pretrial detainee to prevail on a claim of excessive force, the detainee must show that the force purposely or knowingly used against him was objectively unreasonable. Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015). Mere negligence by the officer will not make out a claim. Kingsley, 135 S.Ct. at 2472, citing Daniels v. Williams, 106 S.Ct. 662 (1986) (affirming dismissal of inmate's claim that he slipped on a pillow negligently left on the stairs by a deputy).

The summary judgment evidence leaves no room for dispute on this claim. There is no basis for a claim of excessive force against Deputy Jacobs. The summary judgment evidence indicates that any contact with the door was slight and unintentional, and there was no injury discernable by physical examination or x-ray. Jacobs is entitled to summary judgment with respect to this claim.

**Other Quibbles**

Plaintiff's lengthy filings are full of other complaints about aspects of his medical care. For example, he complains that he was asked to give a second urine sample when he had already given one, and he demanded to know why. He has often expressed disagreement with medical staff and the promptness or nature of the care they afforded. But the hundreds of pages of medical records generated over the course of a few months reflect that Plaintiff received frequent and reasonable care at CCC, which often referred him to Ochsner LSU for specialized physician care.

Plaintiff may be unhappy about aspects of his care, but a claim under 42 U.S.C. § 1983 does not afford a remedy for such unhappiness or dissatisfaction. It addresses only constitutional violations, which require a showing of deliberate indifference to a serious medical need. Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. Estelle, 97 S.Ct. at 291-92. Disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a constitutional claim for indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997). Defendants are entitled to summary judgement with respect to all such claims.

**Caddo Correctional Center**

Plaintiff also named CCC as a defendant. He has not survived summary judgment on any underlying claims that would permit relief, but the CCC is also entitled to dismissal for another reason. "It is well established that a detention center is not a legal entity capable of being sued." Robertson v. Detention Center Claiborne Parish, 2009 WL 3241561 (W.D.

La. 2009). This court has specifically held that CCC is not an entity capable of being sued. It is merely a building and grounds owned by the sheriff. Hicks v. Page, 2010 WL 2243584 (W.D. La. 2010).

Accordingly,

It is recommended that Plaintiff's Motion for Summary Judgment (Doc. 23) be denied, Defendants' Motion for Summary Judgment (Doc. 30) be granted, and all claims against all defendants be dismissed with prejudice.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 9th day of September, 2021.

Mark L. Hornsby
U.S. Magistrate Judge